# IN THE UNITED STATES DISTRICT COURT FOR THE
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA ) | |
| ) | |
| ) | NO. 3:18-cr-00275 |
| v. ) | |
| ) | JUDGE CAMPBELL |
| ) | |
| ADRIAN ABERNATHY ) | |

## MEMORANDUM AND ORDER

### I. Introduction

Pending before the Court are Defendant's Motion to Suppress (Doc. No. 38), and the Government's Response (Doc. No. 44). Through the Motion, Defendant seeks to suppress items recovered from the search of his bags by law enforcement officers, as well as items obtained from a subsequent search of an apartment and vehicles pursuant to a search warrant. The Court held a hearing on the Motion on March 12, 2019. After the hearing, the Court directed the parties to file supplemental briefs on the applicability of *Utah v. Strieff,* ___ U.S. ___, 136 S. Ct. 2056, 195 L. Ed. 2d 400 (2016) to the issues raised in Defendant's Motion. The parties have now filed those briefs. (Doc. Nos. 49, 50).

### II. Evidence Adduced at the Hearing

At the hearing on the Motion, the Government called Berry Hill Police Officer Anthony Russo as their only witness. Officer Russo testified that he has been employed by the Berry Hill Police Department for approximately two years, and before that, he was employed by the Metro Nashville Police Department. Officer Russo said he was called on January 29, 2018, at

approximately 3:19 a.m., to respond to a report of a domestic disturbance at an apartment complex located at 2407 Eighth Avenue – specifically, Apartment 307, located on the third floor. When he and Officer Yoquelet, who accompanied him that night, arrived at the apartment, they found the door to be cracked about six inches, and heard a male voice yelling loudly from inside the apartment. An off-duty officer with the Berry Hill Police Department, Danny Cage, was already at the scene.

Officer Russo, who was in uniform, testified that he knocked on the door and announced himself as a police officer, but no one answered the door and the yelling by the male voice continued. Officer Russo said he then knocked a little harder and put his foot in the doorway to prevent someone from kicking the door back on him. At that point, Officer Russo testified, he observed a male black individual, who was small in stature, running around inside the apartment in his boxer shorts. Officer Russo described the man's underwear as striped and multicolored. Officer Russo then knocked a little harder and announced his presence again. At that point, according to Officer Russo, the male black individual, who he identified as Defendant Abernathy, came and pushed the door back on his face and closed it. Officer Russo said he knocked once again, while explaining that the officers needed to talk to someone to make sure everything was okay. Officer Russo testified he then heard some movement and voices, including a female voice, saying "we're getting dressed; hang on." Officer Russo testified that officers were not supposed to leave the premises until they talked to someone and made sure everyone was okay.

According to Officer Russo, they waited three to four minutes when they were approached by a male from the stairway, who said he lived a lower floor, and told them he believed the person they were trying to speak with just jumped out of the balcony window from above him. Officer

Russo said he told his partner he would go down and see if anyone was there. At that point, according to Officer Russo, he was concerned that there had been an assault and the suspect was trying to get away. When he got downstairs, Officer Russo said he did not see anyone, and then heard his partner say he would be behind him. Officer Russo testified he got into his patrol vehicle, turned to the right and circled the block. He then saw a small, male black (who he identified as the defendant) in the same boxer shorts he had seen earlier. According to Officer Russo, it was cold outside that night.

When he first saw the defendant, Officer Russo testified, he was walking up a hill, talking on a cell phone, and carrying a white trash bag. Officer Russo said he turned on his blue lights and the defendant looked back at him, then started running. Officer Russo testified the defendant ran into a neighbor's yard, threw down his phone, and jumped over a fence. Officer Russo then pulled his car over, got out, and started chasing the defendant. Officer Russo testified that, as he was chasing the defendant, he was telling him to stop, and identifying himself as the police. Officer Russo chased the defendant through a second yard and as the defendant approached another fence, he threw the white bag over the fence and started to climb over. Officer Russo testified that he grabbed the defendant's leg, but part of his body was already over the fence. As they struggled, Officer Russo said, the defendant's shoes and sweatshirt came off. Officer Russo radioed his partner for help, and his partner was able to bring the defendant down on the other side of the fence.

Officer Russo said that when his partner made contact with the defendant, he walked around to the other side of the fence and helped take the defendant into custody. Officer Russo said he took the defendant to the back of his patrol car, approximately 25 to 30 yards away, then

3

called emergency medical services to check the defendant because he had sustained cuts to his legs from climbing over the fence. Officer Russo estimated approximately 15 minutes had elapsed from the time he first arrived at the apartment and the time the defendant was detained. Officer Russo testified his intent was to arrest the defendant for resisting or evading, but he also detained the defendant because he was afraid the defendant would flee again before he could speak with him about the possible domestic disturbance. Later in his testimony, Officer Russo said he was detaining the defendant to speak to him about the possible domestic disturbance, and they put him in handcuffs to prevent him from fleeing again.

Two to three minutes after taking the defendant into custody, Officer Russo went to retrieve the bags the defendant had thrown over the fence. Officer Russo testified that, when the defendant threw the white trash bag over the fence, two black leather duffle-type bags rolled out. According to Officer Russo, the bags were about five feet from the defendant when they took the defendant into custody. Officer Russo said he placed the duffle bags on the hood of his vehicle, unzipped them, and looked inside to make sure they did not contain anything illegal or dangerous, like a bomb or weapons, before placing them in his patrol car. Inside the bags, Officer Russo observed a large quantity of money, and two Ziploc bags of a brown substance that field-tested positive for heroin. Farther down in the bag, Officer Russo observed a loaded Glock handgun, and a small purse, which he did not open. Officer Russo said he then zipped the bags, and put them in the trunk of his patrol car. Officer Russo testified that he considered the search to be an inventory search and/or a search incident to arrest. After finding the large amount of heroin and cash, Officer Russo called in the Metro Nashville Police Department ("Metro").

During the course of the investigation at the scene, Officer Russo testified he checked to see if the defendant had any outstanding warrants:

> Q. A couple of minutes ago I asked you about when someone's taken into custody, or for that matter, if someone's being detained, are you going to run their name for warrants?
>
> A. We do.
>
> Q. And in the course of that, if you find out someone has a warrant, are you going to take that person into custody on the warrant?
>
> A. We are.
>
> Q. And in this instance, the defendant did, in fact, have warrants; is that correct?
>
> A. He did.
>
> Q. Wasn't known to you at the time; is that fair to say?
>
> A. That's fair to say.
>
> Q. But during the course of the investigation out at the scene, you learned that he had warrants?
>
> A. Yes, sir.
>
> Q. So he would have been arrested irrespective on those warrants that night; is that correct?
>
> A. Yes, sir, we would have took him in.
>
> Q. And what would have happened with the bags that he had - - the two bags that are inside the larger white bag, what would have happened with that?
>
> A. We would have still searched them anyways.
>
> Q. So even if you had only detained the defendant out there, you checked him for warrants, found those warrants, you would have taken him into custody on those warrants; is that correct?
>
> A. Yes. I would have made sure the –

> Q. And you would have – under your authority, would have checked the contents of that bag, is that correct?
>
> A. Yes.

(Doc. No. 48, at 36-38). According to Officer Russo, the defendant had two outstanding warrants; one for failure to appear and one for a probation violation.

Officer Russo testified that he drove back to the apartment complex to wait for Metro to arrive, and at that point, the defendant was being transported to the hospital with Officer Yoquelet. Officer Russo said he went back upstairs to the apartment and saw a female sitting with Officer Cage. Officer Russo testified he briefly entered the apartment to make sure no one else was there. Officer Russo said he later picked up the defendant and Officer Yoquelet from the hospital, and took the defendant to booking on his outstanding warrants. Officer Russo testified he was not involved in obtaining the search warrants, or the subsequent searches, in this case, nor was he involved in the charges lodged against the defendant by Metro.

### III. Analysis

The Government argues the detention of the defendant was justified as a *Terry* stop, which developed into an arrest for resisting. The Government also argues that the defendant abandoned any interest in the bags when he threw them over the fence. Finally, the Government argues that exclusion is not the appropriate remedy, and that the attenuation doctrine, discussed in *Utah v. Strieff,* applies here. Defendant argues that he was subjected to an unlawful arrest, and any subsequent search of the bags was unconstitutional. Defendant argues that *Utah v. Strieff* does not apply here.

The Sixth Circuit has explained that there are three type of permissible encounters between the police and citizens: "(1) the consensual encounter, which may be initiated without any objective

level of suspicion; (2) the investigative detention, which, if nonconsensual, must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." *United States v. Gross*, 662 F.3d 393, 399 (6th Cir. 2011).

When a suspect flees from police, a "seizure" does not occur, for purposes of the Fourth Amendment, until the suspect is physically apprehended or actually submits to the authority of the police. *See, e.g., California v. Hodari D.,* 499 U.S. 621, 626, 111 S. Ct. 1547, 1551, 113 L. Ed. 2d 690 (1991); *United States v. Phillips*, 677 Fed. Appx. 294, 295 (2017).

With regard to an investigation detention, or *Terry* stop (based on *Terry v. Ohio*, 392 U.S. 1, 21, 88 S. Ct. 1868, 20 L.Ed.2d 889 (1968)), officers "may briefly detain a person for investigative purposes so long as it is 'reasonable.'" *United States v. Young,* 707 F.3d 598, 603 (6th Cir. 2012). The Sixth Circuit applies a two-part analysis in determining whether a *Terry* stop is reasonable: first, the court asks whether there was reasonable suspicion to initiate the stop; and second, whether the stop was reasonable in scope. *Id.* In considering the first question, the court determines "'whether there was a proper basis for the stop, which is judged by examining whether the law enforcement officials were aware of specific and articulable facts which gave rise to reasonable suspicion' of criminal activity." *Id.* (quoting *United States v. Davis,* 430 F.3d 345, 354 (6th Cir. 2005)). The officer "must have a 'particularized and objective basis for suspecting the particular person stopped of criminal activity.'" *Id.* (quoting *United States v. Caruthers,* 458 F.3d 459, 464 (6th Cir. 2006)). The court looks to the "totality of the circumstances when the *Terry* stop commenced" in making that assessment. *Id.*

At the time Officer Russo and his partner detained Defendant and placed him in the patrol car, they had the following justifications for believing a crime had occurred: knowledge of the

initial call reporting a domestic disturbance at approximately 3:00 a.m.; their having witnessed sustained loud yelling, from a male and a female, at the apartment in question; their having discovered that the male occupant of the apartment, rather than coming to the door and talking with the police, left the apartment by climbing over a balcony to the ground in his underwear and a sweatshirt; their having observed the male occupant begin to run when he saw Officer Russo activate his lights; and their having observed him ignore requests to stop and to continue to flee. Although Officer Russo did not know at that point whether the female in the apartment had been assaulted, it was reasonable for him to attempt to detain the other occupant of the apartment while he investigated that possibility. *See Young*, 707 F.3d at 603-04 (finding that certain factors justified a brief *Terry* stop to investigate whether the defendant had been trespassing). Thus, the Court concludes that Officer Russo was justified in detaining the defendant while he conducted a further investigation.

While at the scene, Officer Russo learned the defendant had two outstanding warrants, which provided probable cause for his arrest. Thus, the Court considers whether the reasonable suspicion for which Officer Russo detained the defendant would have been dispelled before discovery of the outstanding warrants, and whether the warrant check was a reasonable part of that investigation. Officer Russo testified that his practice is to check for outstanding warrants for anyone who is detained or arrested, and that an arrest would follow if outstanding warrants were discovered. According to Officer Russo, the warrant check took place while they were at the scene of the detention. *See Young,* 707 F.3d at 605-06 (holding that officers do not exceed the permissible scope of a *Terry* stop by running a warrant check, even when the warrant check is unrelated to the crime suspected because it may help clear a person's name or may give the officers important

information about the suspect).[1] Thus, the Court concludes that the warrants were discovered before the reasonable suspicion justifying the detention had been dispelled.

The Court's conclusion that the detention was a lawful *Terry* stop is not undermined by Officer Russo's legal characterization of the events in question, which support both an arrest and an investigative detention. By the time Officer Russo discovered the outstanding warrants, the detention of the defendant at the scene was not meaningfully different than an arrest.

Having determined that the detention would have led to a lawful arrest, the Court considers whether Officer Russo's search of the bags was a valid search incident to an arrest. Under the "search incident to arrest" exception to the warrant requirement, after a lawful arrest, the police may search the person of the arrestee, as well as the area within his immediate control. *See, e.g., Birchfield v. North Dakota*, ___ U.S. ___, 136 S. Ct. 2160, 2176, 195 L. Ed. 2d 560 (2016). "The mere fact that an arrestee has been subdued and handcuffed in no way signals the end of exigent circumstances, and cannot preclude a search of the arrestee's person and surrounding area." *Dillard*, 78 Fed. Appx at 512. In *Dillard*, the Sixth Circuit determined this exception applied to a fact situation similar to that presented here:

> When the police approached Dillard to arrest him, he was carrying a briefcase, which he then discarded. After police arrested and subdued a violently struggling Dillard, they then searched the briefcase he had originally been carrying. This action epitomizes the doctrine of search incident to arrest. '[W]hen a container is within the immediate control of a subject *at the beginning of an encounter* with law enforcement officers; and when the officers search the container *at the scene of the arrest*; the Fourth Amendment does not prohibit a reasonable delay . . . between the elimination of the danger and the search.' The district court had ample grounds for its conclusion that the search of Dillard's briefcase was incident to a lawful arrest, and we affirm its ruling.

---

[1] Defendant's argument that the warrants were discovered "well after" the detention and search is not supported by the record. (Doc. No. 49).

*Id.,* at 513 (quoting *United States v. Han,* 74 F.3d 537, 543 (4th Cir. 1996) (emphasis added)); *see also United States v. Latham,* ___ Fed. Appx. ___, 2019 WL 549577, at *2 (6th Cir. Feb. 12, 2019) (explaining that a formal custodial arrest need not precede a search incident to arrest as long as the formal arrest follows quickly, and the fruits of the search are not necessary to sustain probable cause to arrest). Officer Russo's search of the bags took place within minutes of the defendant's detention. Thus, the Court is persuaded that Officer Russo's search of the bags was a valid search incident to arrest.

Alternatively, assuming the seizure of the defendant was unlawful, the Court considers whether the contents of the bags are nevertheless admissible under the attenuation doctrine discussed in *Utah v. Strieff*. In *Strieff*, the defendant was unlawfully detained by a police officer, and during that detention, the officer discovered an outstanding arrest warrant for the defendant. 136 S. Ct. at 2060. After arresting the defendant on the warrant, the officer searched the defendant incident to arrest, and discovered a baggie of methamphetamine and drug paraphernalia. *Id.* The Utah Supreme Court held the attenuation doctrine did not apply because a voluntary act of the defendant did not break the connection between the illegal search and the discovery of the evidence. *Id.* The Supreme Court granted certiorari in the case to consider "how the attenuation doctrine applies where an unconstitutional detention leads to the discovery of a valid arrest warrant." *Id.*

At the outset, the Supreme Court explained that the attenuation doctrine, which "evaluates the causal link between the government's unlawful act and the discovery of evidence," is not limited to independent acts by the defendant. *Id.* at 2061. The Court then considered whether the discovery of a valid arrest warrant was a sufficient intervening event to break the causal link

between the unlawful stop and the discovery of drug-related evidence on the defendant's person. *Id.* In making that determination, the Court looked at three factors: (1) the "temporal proximity" between the unconstitutional conduct and the discovery of evidence; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct, which the Court described as "'particularly' significant." *Id.* at 2062.

The Court found the first factor favored suppressing the evidence because only minutes elapsed between the illegal stop and the discovery of the contraband on the defendant. On the other hand, the Court concluded that the presence of intervening factors – discovery of the arrest warrant – strongly favored admissibility because "the [arrest] warrant was valid, it predated Officer Fackrell's investigation, and it was entirely unconnected with the stop." *Id.* Once the officer discovered the warrant, the Court explained, he had an obligation to arrest the defendant:

> 'A warrant is a judicial mandate to an officer to conduct a search or make an arrest, and the officer has a sworn duty to carry out its provisions.' *United States v. Leon*, 468 U.S. 897, 920, n. 21, 104 S. Ct. 3405, 82 L.Ed.2d 677 (1984) (internal quotation marks omitted). Officer Fackrell's arrest of Strieff thus was a ministerial act that was independently compelled by the pre-existing warrant. And once Officer Fackrell was authorized to arrest Strieff, it was undisputedly lawful to search Strieff as an incident of his arrest to protect Officer Fackrell's safety. *See Arizona v. Gant*, 556 U.S. 332, 339, 129 S. Ct. 1710, 173 L.Ed.2d 485 (2009) (explaining the permissible scope of searches incident to arrest).

136 S. Ct. at 2062–63. Applying the third factor, the Court determined that the officer's conduct was, at most, negligent, pointing out that he should have requested to speak with the defendant rather than demanding the defendant speak with him. The Court explained that, while the officer's decision to initiate the stop was mistaken, his conduct thereafter was lawful: "The officer's decision to run the warrant check was a 'negligibly burdensome precautio[n]' for officer safety . . . And Officer Fackrell's actual search of Strieff was a lawful search incident to arrest." *Id.* at 2063. The

Court noted that "there is no indication that this unlawful stop was part of any systemic or recurrent police misconduct." *Id.*

Apply those factors, the Court held that the attenuation doctrine applied:

> Although the illegal stop was close in time to Strieff's arrest, that consideration is outweighed by two factors supporting the State. The outstanding arrest warrant for Strieff's arrest is a critical intervening circumstance that is wholly independent of the illegal stop. The discovery of that warrant broke the causal chain between the unconstitutional stop and the discovery of evidence by compelling Officer Fackrell to arrest Strieff. And, it is especially significant that there is no evidence that Officer Fackrell's illegal stop reflected flagrantly unlawful police misconduct.

*Id.*

Defendant argues that *Strieff* does not apply to the facts here because the unlawful detention and search occurred before the arrest warrants were discovered. Courts have pointed out, however, that *Strieff* does not limit its application of the attenuation doctrine to the exact sequence of events at issue there. *See, e.g., United States v. Patrick,* 842 F.3d 540 (7th Cir. 2016); *United States v. Williams*, 2017 WL 3608221, at *3-5 (N.D. Ind. Aug. 22, 2017); *United States v. Hodgkin,* 2017 WL 6029686, at *6 (D. Nev. May 24, 2017).

Applying the *Strieff* factors here, the temporal proximity between the stop and the search of the bags weighs in favor of suppression because Officer Russo testified only two to three minutes passed between the two events. As for the second factor – the presence of intervening circumstances, this case presents essentially the same factual scenario as *Strieff*: the outstanding arrest warrants for the defendant were valid; they predated Officer Russo's investigation; and they were entirely unconnected with the stop. Officer's Russo's arrest of the defendant on the warrants would have been "a ministerial act" that was compelled by the warrants. And once Officer Russo was authorized to arrest the defendant, it was lawful for him to search the defendant incident to arrest. This factor weighs heavily against suppression.

Finally, the evidence in the record does not support a finding of "police misconduct," systemic or otherwise. Officer Russo was faced with the flight of a potential suspect to a potential assault, and needed to make on-the-spot decisions for purposes of investigation and the safety of himself and others. Although the defendant emphasizes Officer Russo's confusion about whether he could arrest the defendant for "resisting" or "evading" or whether he could detain him to investigate, that confusion suggests negligence in grasping the finer points of Fourth Amendment law rather than any purposeful misconduct.

For these reasons, the Court concludes that Defendant's challenge to the admissibility of the evidence in the bags, and otherwise, is without merit. Accordingly, Defendant's Motion to Suppress (Doc. No. 38) is **DENIED.**

It is so **ORDERED**.

_____
WILLIAM L. CAMPBELL, JR.
UNITED STATES DISTRICT JUDGE